**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**ELNAZ ABEDINIGALANGASHY,** *et al.*,

**Plaintiffs,**

v.

**THE GOVERNMENT OF THE**
**ISLAMIC REPUBLIC OF IRAN,** *et al.*,

**Defendants.**

---

Civil Action No. 23-1105 (JEB)

## MEMORANDUM OPINION

Plaintiffs are immediate relatives of Saeed Abedini, an American who spent several years in captivity in Iran. In July 2012, the Iranian Revolutionary Guard Corps took him hostage and detained him until January 2016. During those three and a half years, Abedini was interrogated, tortured, and beaten. After successful lawsuits, he and his sister, Zibandeh Abedini Galangashy, as well as Abedini's ex-wife and children, received compensation for their injuries. His other sister, brother, and mother now come before this Court seeking recompense for their own injuries from Defendants, the Islamic Republic of Iran and its instrumentalities, via the terrorism exception to the Foreign Sovereign Immunities Act. As Iran failed to appear, default was entered this year. It now falls to the Court to determine whether to award default judgment and, if so, what damages are appropriate.

As Plaintiffs have complied with all procedural prerequisites, the first task is easy: a default judgment is warranted in this case. Determining the fair <u>amount</u> of damages, conversely, requires a difficult weighing of relative injuries. The Court ultimately holds that respective sums

1

of $1,250,000 to each of Abedini's siblings, Elnaz Abedinigalankashy and Vahid

Abedinigalankashy, and $3,000,000 to his mother, Bi Bi Tahereh Karmimi Izadi, are appropriate,

yielding a total of $5,500,000.  No punitive damages will be awarded, however.

## I.   Background

The Court uses first names here to avoid confusion and not for any lack of respect.  The

details of Abedini's arrest, torture, and confinement are set forth in Abedini v. Islamic Republic

of Iran, 422 F. Supp. 3d 118 (D.D.C. 2019).  In short, Plaintiffs' home in Iran was raided by

armed Islamic Revolutionary Guard Corps (IRGC) personnel on September 26, 2012, following

which they took Abedini to Evin Prison, where he was held hostage.  See ECF No. 16 (Motion

for Default Judgment) at 4.  IRGC personnel also seized Plaintiffs' belongings and demanded

that they provide their usernames and passwords and sign blank documents at gunpoint.  Id.  In

the months following Abedini's arrest, all three Plaintiffs were interrogated by Iranian

intelligence agents and told that they were "under total surveillance."  Id. at 6.  On January 27,

2013, Abedini was sentenced to eight years in prison.  See ECF No. 17 (Revised Declaration of

Vahid Abedinigalangashy), ¶ 36.  It was not until three years later, on January 16, 2016, that he

was released.  See ECF No. 16-2 (Declaration of Elnaz Abedinigalangashy), ¶ 49.

A few months after Abedini's arrest, Elnaz Abedinigalangashy, his younger sister, was

hospitalized for a panic attack, which she attributed to "the thought of being interrogated again."

Id., ¶ 41.  She was released after being prescribed depression and anxiety medication.  Id.

Fearing for her safety, she and her brother Vahid fled to Turkey in March 2013, six months after

Abedini's arrest.  Id., ¶ 42.  Now married and living in South Carolina, Elnaz continues to suffer

from the trauma of her brother's detention; she deals "with fear and anxiety daily."  Id., ¶ 66.

Vahid Abedinigalangashy, Abedini's younger brother, was interrogated at least nine times in the six months following Abedini's arrest.  See Vahid Decl., ¶¶ 23, 26–30.  These interrogations rendered him "physically sick daily" and unable to sleep.  Id., ¶ 33.  During this time, he went to the hospital emergency room twice for chest pains.  Id., ¶ 34.  Even after he arrived in Turkey with Elnaz, he was hospitalized twice more, again for chest pains.  Id., ¶ 44.  Now living in Virginia, Vahid continues to be haunted by his interrogations.  Id., ¶ 50.  He went to the emergency room two more times before finally learning that his chest pains were panic attacks and receiving an anxiety diagnosis.  Id., ¶ 54.  He still lives in fear of the Iranian government.  Id., ¶ 60.

Bi Bi Tahereh Karmini Izadi, Abedini's mother, stayed behind when the other Plaintiffs fled to Turkey, splitting her time between the U.S. and Iran.  See ECF No. 16-4 (Declaration of Bi Bi Tahereh Karmimi Izadi), ¶¶ 28–30.  She thus witnessed more of Abedini's confinement than the other Plaintiffs.  Only thirty minutes after her son's arrest, she was rushed to the hospital because she was "shaking and turned completely white."  Id., ¶ 13.  The first time she saw her son in prison, she fainted.  Id., ¶ 22.  Months later, when Abedini was hospitalized for injuries sustained from torture, she visited him at the hospital and directly witnessed the prison's denial of medical care when they refused to allow him to undergo a much-needed surgery.  Id., ¶¶ 35–36.  During Abedini's imprisonment, she went to the emergency room several times, each time believing that she was dying.  Id., ¶ 17.  On these occasions, she was sedated and sent home with medication.  Id.  After moving to the U.S., she went to the emergency room thrice, although the reasons for these visits are unclear from the record.  Id., ¶ 45.  She now lives with Vahid in Lynchburg.  Id., ¶ 47.

Plaintiffs filed this suit on April 20, 2023, and named Iran and "[i]ts Ministries, Agencies, and Instrumentalities" as Defendants.  See ECF No. 1 (Complaint).  The Court will refer to Defendants collectively as "Iran."  Plaintiffs effected service on January 29, 2024.  See ECF No. 15 (Default Entry) at 1.  Iran failed to answer the Complaint, and Plaintiffs requested an entry of default on April 1, 2024, which was granted one day later.  See ECF No. 14 (Default Request); Default Entry.  Plaintiffs now move for default judgment as to both liability and damages.

## II.   Legal Standard

Where a defendant is "totally unresponsive," a court may enter default judgment if the default is plainly willful — as reflected by a defendant's failure to respond to the summons and complaint, the entry of default, or the motion for default judgment.  Gutierrez v. Berg Contracting Inc., 2000 WL 331721, at *1 (D.D.C. March 20, 2000) (quoting Jackson v. Beech, 636 F.2d 831, 836 (D.C. Cir. 1980)).  In the "'absence of any request to set aside the default or suggestion by the defendant that it has a meritorious defense,' it is clear that the standard for default judgment has been satisfied."  Int'l Painters & Allied Trades Indus. Pension Fund v. Auxier Drywall, LLC, 531 F. Supp. 2d 56, 57 (D.D.C. 2008) (quoting Gutierrez, 2000 WL 331721, at *1).

To obtain a default judgment in such an action, plaintiffs must establish their claims "by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  Those who are successful may then recover damages by showing "that the projected consequences are reasonably certain (i.e., more likely than not) to occur, and [proving] the amount of damages by a reasonable estimate."  Fraenkel v. Islamic Republic of Iran, 892 F.3d 348, 353 (D.C. Cir. 2018) (quoting Hill v. Republic of Iraq, 328 F.3d 680, 684 (D.C. Cir. 2003)).  While these requirements create "some

protection against an unfounded default judgment," plaintiffs need not produce "more or different evidence than [a court] would ordinarily receive; indeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required." Id. (alteration in original) (quoting Owens v. Republic of Sudan, 864 F.3d 751, 785 (D.C. Cir. 2017)).  In any event, when a foreign state fails to make an appearance, the court must still determine that an exception to immunity applies and that the plaintiff has a sufficient legal and factual basis for his claims.  See Jerez v. Republic of Cuba, 777 F. Supp. 2d 6, 18–19 (D.D.C. 2011).

As is common in FSIA litigation, this Court takes judicial notice of the facts presented in the two other cases revolving around Abedini's detention and torture.  Abedini, 422 F. Supp. 3d 118; Panahi v. Islamic Republic of Iran, 2020 WL 6591425 (D.D.C. Nov. 10, 2020).  See Goldstein v. Islamic Republic of Iran, 2018 WL 6329452, at *2 (D.D.C. Dec. 4, 2018); Barry v. Islamic Republic of Iran, 410 F. Supp. 3d 161, 168 n.1 (D.D.C. 2019) ("[A] court may take judicial notice of 'adjudicative facts' 'not subject to reasonable dispute' that are 'capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned,' Fed. R. Evid. 201(b), including 'court records in related proceedings.'") (cleaned up); Foley v. Syrian Arab Republic, 249 F. Supp. 3d 186, 191 (D.D.C. 2017) (holding judicial notice extends to proceedings that took place before different judge).

## III.   Analysis

The Court will proceed in three steps.  It first addresses jurisdictional prerequisites, then evaluates available causes of action, Defendants' liability, and appropriate damage awards.

### A.   Jurisdiction

Foreign states are generally immune from suit in U.S. federal court.  See 28 U.S.C. § 1604.  "[T]he FSIA [is] the sole basis for obtaining jurisdiction over a foreign state in federal

court," Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 439 (1989), and it grants "a federal district court . . . personal and subject matter jurisdiction over a foreign entity in certain circumstances." Owens v. Republic of Sudan, 826 F. Supp. 2d 128, 148 (D.D.C. 2011). The Court looks separately at subject-matter and personal jurisdiction.

        1.    *Subject-Matter Jurisdiction*

Relevant here for the first issue is 28 U.S.C § 1605A, the so-called "terrorism exception." See Fraenkel, 892 F.3d at 352. Plaintiffs may establish subject-matter jurisdiction under this exception by showing that (a) the foreign state lacks immunity and (b) their claim meets certain statutory prerequisites. See 28 U.S.C. § 1605A(a)(1), (2).

        a.   Immunity

The terrorism exception provides that "[a] foreign state shall not be immune from the jurisdiction" of U.S. courts where (1) "money damages are sought" (2) "against a foreign state" for (3) "personal injury or death" that (4) "was caused" (5) "by an act of torture, . . . hostage taking, or the provision of material support or resources for such an act." Id. at § 1605A(a)(1); see also Oveissi v. Islamic Republic of Iran, 879 F. Supp. 2d 44, 51 (D.D.C. 2012) (quoting this language); Wultz v. Islamic Republic of Iran, 864 F. Supp. 2d 24, 32 (D.D.C. 2012) (same).

Plaintiffs' claims meet all five conditions. First, they seek only money damages. See Mot. Default J. at 14. Second, they lodge their claims against Iran and its "Ministries, Agencies, and Instrumentalities." Compl. at 1. Third, Plaintiffs' claims arise out of Abedini's personal injuries from his detention and torture. See Mot. Default J. at 1; Oveissi, 879 F. Supp. 2d at 51 (finding third factor was met where claims "clearly involve 'personal injury or death'" of victim). Fourth, the IRGC — indisputably a part of the Iranian government — caused Plaintiffs' injuries. See Panahi, 2020 WL 6591425, at *7 ("It has been recognized by both a district court

and Congress that Iran was responsible for [Abedini's] detention and torture.") (citing Abedini, 422 F. Supp. 3d at 126, and House Resolution 111 (Feb. 13, 2015)); see also Schertzman Cohen v. Islamic Republic of Iran, 2019 WL 3037868, at *3 (D.D.C. July 11, 2019) (holding IRGC "is part of the Iranian government").  Fifth and finally, Iran both (i) tortured Abedini and (ii) took him hostage.  See Abedini, 422 F. Supp. 3d at 126–27.  Since Plaintiffs have satisfied all five requirements, the Court concludes that Iran does not have immunity under the FSIA.

> ### b.  Claim Prerequisites

FSIA plaintiffs face an additional hurdle.  Section 1605A(a)(2) provides that "[t]he court shall hear a claim under this section" only if three conditions are met: (1) "the foreign state was designated as a state sponsor of terrorism at the time [of] the act . . . and . . . remains so designated when the claim is filed"; (2) "the claimant or the victim was, at the time [of] the act[,] . . . a national of the United States"; and (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim."  28 U.S.C. § 1605A(a)(2)(A)(i)–(iii).

Plaintiffs once again meet all of these conditions.  First, Iran has been designated as a state sponsor of terrorism since 1984.  See Dep't of State, Bureau of Counterterrorism, State Sponsors of Terrorism, https://www.state.gov/state-sponsors-of-terrorism/ (last visited Jun. 26, 2024).  Second, Abedini, the victim, is — and was at the time of his captivity — a U.S. national. See Mot. Default J. at 14.  Even though Plaintiffs were not, a claim will be heard whenever "the claimant or the victim" was a U.S. national at the time of the incident.  See 28 U.S.C. § 1605A(a)(2)(A)(ii) (emphasis added).  Third, Plaintiffs offered Iran a reasonable opportunity to arbitrate the claim by including an arbitration offer in the documents served on the country.  See ECF No. 5 (State Department Service Affidavit); see also Simpson v. Socialist People's Libyan

Arab Jamahiriya, 326 F.3d 230, 233 (D.C. Cir. 2003) (finding arbitration offer filed after complaint gave defendant "a 'reasonable opportunity' to arbitrate") (quoting 28 U.S.C. § 1605(a)(7)(B)(i)).  This Court therefore has subject-matter jurisdiction pursuant to 28 U.S.C. § 1605A.

        2.    *Personal Jurisdiction*

Moving on, the Court may exercise personal jurisdiction over a foreign state if service of process is properly effectuated under 28 U.S.C. § 1608(a).  See, e.g., Schubarth v. Fed. Republic of Germany, 891 F.3d 392, 397 n.1 (D.C. Cir. 2018).  By first attempting mail service pursuant to 28 U.S.C. § 1608(a)(3) and then transmitting the documents through the Secretary of State according to §1608(a)(4), Plaintiffs properly served Defendants.  See Mot. Default J. at 11; Abedini v. Islamic Republic of Iran, 2019 WL 3037518, at *2–3 (D.D.C. July 11, 2019).  The Court thus has personal jurisdiction over Iran.

        B.    Causes of Action

Although jurisdiction is assured, Plaintiffs still need a cause of action — state or federal — to get into court.  See Owens, 864 F.3d at 807 ("[T]he question whether a statute withdraws sovereign immunity is analytically distinct from whether a plaintiff has a cause of action.") (internal quotation marks omitted).  Prior to 2008, the FSIA operated as a "pass-through" statute, allowing state claims to proceed under federal jurisdiction.  Id. at 808.  In 2008, however, the FSIA was amended to provide a federal cause of action to: "(1) a national of the United States, (2) a member of the armed forces, (3) an employee of the Government of the United States[,] . . . or (4) the legal representative of [such persons described above]."  28 U.S.C. § 1605A(c).

Elnaz, despite being born abroad, became a U.S. citizen before this suit was filed, so she has a federal cause of action.  See Elnaz Decl., ¶ 61; Estate of Fouty v. Syrian Arab Rep., 2024

WL 3443591, at *25 (D.D.C. July 17, 2024) (FSIA cause of action, unlike waiver of sovereign immunity, does not require claimant to have been U.S. national at time of terrorist incident); Cabrera v. Islamic Rep. of Iran, 2023 WL 3496303, at *6 (D.D.C May 16, 2023) (same).  The remaining Plaintiffs, by contrast, were not U.S. nationals at any point during Abedini's captivity and did not become citizens (if at all) until after suit was filed.  They thus do not have federal causes of action.  See Mot. Default J. at 16; see also Estate of Doe v. Islamic Republic of Iran, 808 F. Supp. 2d 1, 18 (D.D.C. 2011) ("A straightforward reading of § 1605A(c) creates a cause of action for four categories of individuals . . . . Absent from these four categories are non-U.S. national family members of the victims of terrorist attacks."); Owens, 826 F. Supp. 2d at 152 ("The plain meaning approach to statutory construction governs the Court's interpretation of § 1605A(c).").

Although Vahid and Bi Bi lack a federal cause of action, Section 1605A "did not displace a claimant's ability to pursue claims under applicable state or foreign law" upon a showing of subject-matter jurisdiction.  See Owens, 864 F.3d at 808 (quoting Leibovitch v. Islamic Republic of Iran, 697 F.3d 561, 572 (7th Cir. 2012)).  This Court maintains jurisdiction over all Plaintiffs' claims, moreover, because the victim — Abedini — is a U.S. national.  See 28 U.S.C. § 1605A(a)(2)(A)(ii) (granting jurisdiction when "[t]he claimant or the victim was . . . a national of the United States"); Leibovitch, 697 F.3d at 571 ("Congress has established a private right of action principally for American claimants while waiving sovereign immunity in a broader set of cases also involving American victims.").  The Court must thus assess these two Plaintiffs' ability to recover under applicable state law.  See Owens, 864 F.3d at 809 (holding § 1605A(c) does not "foreclose access to state law by those who need it, as do foreign family members," and "the pass-through approach remains viable" for them).

C.      Liability

"There can be no question that Iran caused [Abedini's] injuries."  Abedini, 422 F. Supp.

3d at 132 (citing Abedini's Declaration naming IRGC as perpetrators); Schertzman Cohen, 2019

WL 3037868, at *3 (holding IRGC "is part of the Iranian government").  Having so found, the

Court now turns to each Plaintiff's theories of liability, which rely on state-common-law torts.

See Owens, 864 F.3d at 809 (holding foreign family members of FSIA victims may "pursue

claims under applicable state or foreign law upon the waiver of sovereign immunity") (quoting

Estate of Doe, 808 F. Supp. 2d at 20).  The Court must first determine which state's law applies

before moving to the merits of the causes of action.

1.      *Choice of Law*

As the forum state, the District of Columbia's choice-of-law rules govern.  See Estate of

Doe, 808 F. Supp. 2d at 20.  The Court consults those rules in assessing whether the law of Iran,

D.C., South Carolina (where Elnaz lives), or Virginia (where Vahid and Bi Bi live) should

control for Plaintiffs' respective claims.  "To determine which jurisdiction's substantive law

governs a dispute, District of Columbia courts blend a 'governmental interests analysis' with a

'most significant relationship' test."  Oveissi v Islamic Republic of Iran, 573 F.3d 835, 842 (D.C.

Cir. 2009) (quoting Hercules & Co., Ltd. v. Shama Rest. Corp., 566 A.2d 31, 40–41 & n.18

(D.C. 1989)); see also Estate of Doe, 808 F. Supp. 2d at 20.  Based on the Court's analysis in

Abedini and to ensure consistency with that Opinion, the Court will apply D.C.'s standards of

liability to Plaintiffs' claims.  See 422 F. Supp. 3d at 134–35.

2.      *IIED Liability*

Plaintiffs raise one theory of liability under D.C. law — intentional infliction of

emotional distress.  See Republic of Sudan v. Owens, 194 A.3d 38, 42 (D.C. 2018) (allowing

non-U.S. immediate family members to recover for IIED in cases where FSIA terrorism exception applies).  In IIED cases brought by family members of victims injured by tortious conduct, D.C. law imposes liability when the defendant "(1) engaged in extreme and outrageous conduct (2) which was directed at persons other than plaintiffs (3) which intentionally or recklessly caused severe emotional distress, but not necessarily bodily harm, (4) to such persons' immediate family members — the immediate [] family requirement — who were present at the time such conduct occurred — the presence requirement."  Murphy v. Islamic Republic of Iran, 740 F. Supp. 2d 51, 75 (D.D.C. 2010) (citing Restatement (Second) of Torts § 46(1)–(2)(a)); see also Owens, 194 A.3d at 42 (adopting Restatement elements).  The same principles govern Plaintiff Elnaz's federal claims.  See Abedini, 422 F. Supp. 3d at 132–33.  The Court will assess each element in turn.

First, acts of terror are inherently "extreme and outrageous," Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 77 (D.D.C. 2010) (quoting Belkin v. Islamic Republic of Iran, 667 F. Supp. 2d 8 (D.D.C. 2009)), and this element is satisfied when a victim's family member brings an IIED claim.  See Sutherland v Islamic Republic of Iran, 151 F. Supp. 2d 27, 50 (D.D.C. 2001); Jenco v. Islamic Republic of Iran, 154 F. Supp. 2d 27, 35–36 (D.D.C. 2001).  By taking Abedini hostage and torturing him, Defendants engaged in "extreme and outrageous" conduct.

Both the second and third elements were satisfied when the IRGC imprisoned Abedini — intentionally causing Plaintiffs severe emotional distress.  First, Plaintiffs did in fact suffer such distress.  Each alleges intense emotional pain, including anxiety and depression, as a result of Abedini's abduction.  See Bi Bi Decl., ¶ 15; Vahid Decl., ¶ 60; Elnaz Decl., ¶ 66.  Even today, Elnaz "ha[s] not felt safe a single day," Vahid "still fear[s] that agents of the Iranian government will hurt either [Abedini], myself, or other members of my family," and Bi Bi lost her "feeling of

safety, and [her] physical and mental wellbeing."  Elnaz Decl., ¶ 66; Vahid Decl., ¶ 60; Bi Bi

Decl., ¶ 46.  Elnaz and Vahid uprooted their lives in Iran and moved to Turkey after living in fear

of constant interrogations.  See Vahid Decl., ¶¶ 33, 37–40.  Bi Bi took turns with her husband to

move between the U.S. and Iran so that they could maintain green-card status while ensuring one

of them was in Iran to watch over Abedini in prison.  See Bi Bi Decl., ¶ 29.  As a result, she

"barely saw [her] husband for the next two years."  Id.; see Sutherland, 151 F. Supp. 2d at 50

(finding wife of hostage suffered severe emotional distress during his captivity by "liv[ing] a life

of isolation and dashed hopes" for over six years and suffering "repeated anxiety attacks").

Iran, moreover, intentionally caused that distress.  See Sutherland, 151 F. Supp. 2d at 50

(finding intent because hostage taking "is implicitly intend[ed] to cause emotional distress

among the members of that hostage's immediate family," and the captor "implicitly believes that

such emotional distress is substantially certain to result").  Although Defendants sought to

leverage Abedini's captivity against the U.S. — and not Plaintiffs — they still inflicted

intentional harm upon Plaintiffs because "even if the hostage's country (rather than his family)

pays for his release, a hostage's loved ones play a vital role in agitating for governmental

action."  Id.  At the very least, these elements are satisfied because Defendants "acted in callous

disregard of the obvious risk that such emotional distress would result."  Id.

Finally, Plaintiffs are immediate family members, see Jenco, 154 F. Supp. 2d at 36 n.8

(stating immediate family members include parents and siblings), and the presence requirement

does not apply to immediate family members of hostages.  Id. at 36 (holding presence

requirement not applicable in hostage cases because "plaintiff's lack of presence is the exact

source of his emotional distress," and "limit[ing] recovery in hostage cases using a 'presence'

test . . . would [bar] recover[y] despite there being extremely strong evidence of significant

emotional suffering"); Owens, 194 A.3d at 42 ("[P]resence at the scene is not required in this special [terrorism] context."). As Abedini's sister, brother, and mother, Plaintiffs can recover for IIED.

D.   Damages

While establishing liability here is relatively straightforward, that is not the case with determining damages. The valuation of serious psychological injuries among victims and family members is an inherently delicate task, not susceptible to rote calculations. Here, Plaintiffs seek loss-of-solatium damages. Although they also make cursory references to economic damages, they have neither named a specific number nor substantiated any estimate, so the Court will disregard that request. Barry, 410 F. Supp. 3d at 180 ("A plaintiff must support a claim for lost earnings with competent evidence.") (cleaned up); see also Moradi v. Islamic Republic of Iran, 77 F. Supp. 3d 57, 71 (D.D.C. 2015) (rejecting plaintiff's estimate for lack of "evidentiary support" because "lost earnings are not hard to quantify"). It will instead first address compensatory damages before turning to punitives.

Plaintiffs seek damages for their emotional pain and suffering during and following Abedini's torture and detention. See Mot. Default J. at 1, 21–22. As defined by the D.C. Circuit in Fraenkel, these damages seek to compensate claimants for the "[m]ental anguish, bereavement and grief" resulting from a loved one's death or injury. See 892 F.3d at 356–57. Non-U.S. family members of FSIA terrorism victims may recover these damages. See Mwila v. Islamic Republic of Iran, 33 F. Supp. 3d 36, 41, 44 (D.D.C. 2014); see also Wamai v. Republic of Sudan, 60 F. Supp. 3d 84, 89–90, 94–96 (D.D.C. 2014), (awarding solatium damages to foreign family members for IIED under D.C. law). Although it is undeniably difficult to quantify a family member's suffering, "the Court may look to prior decisions . . . awarding damages for solatium"

as guidance.  Mwila, 33 F. Supp. 3d at 44 (quoting Acosta v. Islamic Republic of Iran, 574 F.

Supp. 2d 15, 29 (D.D.C. 2008)); Murphy, 740 F. Supp. 2d at 78.

The common framework for solatium damages was established in Heiser v. Islamic

Republic of Iran, 466 F. Supp. 2d 229 (D.D.C. 2006).  Under this framework, parents and

siblings of victims who were injured by, but survived, a terrorist attack receive $2.5 million and

$1.25 million, respectively.  Peterson v. Islamic Republic of Iran, 515 F. Supp. 2d 25, 52 (D.D.C.

2007); accord Kirschenbaum v. Islamic Republic of Iran, 572 F. Supp. 2d 200, 213 (D.D.C.

2008) (parent); Mwila, 33 F. Supp. 3d at 45 (sibling).  While this framework is not a mandatory

measure of solatium damages, see Fraenkel, 892 F.3d at 351 (holding that "[t]he decision in

Heiser . . . is not binding precedent" and that, subject to abuse-of-discretion review, district

courts have wide latitude to craft damage awards "based on the particular facts of each case"),

courts have commonly adopted the Heiser framework when awarding damages to family

members in cases like this one.  See, e.g., Reed, 845 F. Supp. 2d at 213–14; Wyatt v. Syrian

Arab Republic, 908 F. Supp. 2d 216, 232 (D.D.C. 2012).  Seeing no reason to part from Heiser,

which Plaintiffs agree governs, the Court will first discuss Elnaz and Vahid's claims based on the

sibling baseline, then turn to Bi Bi's claim based on the parent baseline.

          1.    *Elnaz and Vahid*

Under Heiser, both Elnaz and Vahid would typically receive $1.25 million.  Plaintiffs

nonetheless seek a multiplier of 2.5 for an upward adjustment to $3.125 million each.  This

Court, however, will not deviate upward beyond the Heiser baseline.

Courts have found several factors significant when considering whether to award a higher

sum: (1) whether family members had an "extraordinarily close relationship" with the victim, see

Jenco, 154 F. Supp. 2d at 38 (noting upward deviation may be proper when victim "fulfil[s] the

role of father for his brothers"); (2) whether the family member's emotional trauma was particularly severe, see Oveissi v. Islamic Republic of Iran, 768 F. Supp. 2d 16, 29 (D.D.C. 2011) (awarding 50% upward deviation from Heiser framework to grandson of victim whose trauma affected his development at a young age because his family was forced to go into hiding); and (3) whether the circumstances of the attack made the suffering particularly agonizing for the family. As this Court previously noted, moreover, it "has a duty to scrutinize plaintiff's allegations and should not unquestioningly accept a complaint's unsupported allegations as true." Pautsch v. Islamic Republic of Iran, 2023 WL 8433216, at *2 (D.D.C. Dec. 5, 2023) (cleaned up). The Court's duty to examine allegations carefully and question them does not disappear once liability has been found. See Amirentezam v. Islamic Republic of Iran, 2023 WL 5724121, at *11 (D.D.C. Sept. 5, 2023) ("[A] court does not take factual allegations related to damages as true ... [and] makes its damages determination in light of the facts and circumstances of the case at hand.") (cleaned up).

None of these three aforementioned circumstances is acutely present in Elnaz's or Vahid's case. As to the first, this Court has already held that Abedini's relationship with his other sister, Zibandeh, was not so extraordinarily close as to justify an upward departure, Abedini, 422 F. Supp. 3d at 140, and Plaintiffs do not contend that their relationship with their brother is any different. See Mot. Default J. at 21 ("Abedini has a close relationship [with] Elnaz and Vahid, just as he has a close relationship with his other sister Zibandeh . . . .").

The second factor also does not merit an upward departure. Plaintiffs point to their hospitalizations as a result of stress, see id. at 22, but this Court rejected a similar argument recently in Pautsch v. Islamic Republic of Iran, 2024 WL 2864215 (D.D.C. June 6, 2024). In that case, the plaintiff's nervous breakdowns lacked an adequate nexus to his brother's death and

thus failed to justify an upward departure from the <u>Heiser</u> baseline, even though the plaintiff in that case "require[d] involuntary commitment and six months of monitoring," which is more severe treatment than what Plaintiffs required here.  <u>Id.</u> at *2–3.  Here, too, Plaintiffs fail to connect the dots between Abedini's imprisonment and torture and their hospitalizations.  <u>Id.</u> at *3.  Elnaz attributes her panic attack to "[t]he thought of being interrogated again" by Iranian agents, not to emotional distress about her brother's captivity.  <u>See</u> Elnaz Decl., ¶ 41.  Vahid was interrogated at least nine times in six months, rendering him "physically sick daily" and unable to sleep.  <u>See</u> Vahid Decl., ¶¶ 23, 26–30, 33.  Without more explanation, his two hospital visits for chest pains "during this time" seem to be caused by his recurring and unpredictably timed interrogations, not by his brother's imprisonment.  <u>Id.</u>, ¶¶ 33–34.  Loss-of-solatium damages, however, provide compensation for "the mental anguish, bereavement, and grief" caused by a loved one's death or injury.  <u>Fraenkel</u>, 892 F. 3d at 356–57 (cleaned up).  By seeking an upward adjustment for their own interrogation-induced symptoms, Plaintiffs ask to be compensated for harm Iran has caused them <u>directly</u>, not harm Iran caused them through its abuse of Abedini.

For the third factor, unlike in <u>Daliberti v. Republic of Iraq</u>, 146 F. Supp. 2d 19, 26 (D.D.C. 2001), Elnaz and Vahid were kept informed of their brother's whereabouts throughout his confinement.  <u>See</u> Vahid Decl., ¶ 41.  As a result, none of the three factors warrants an upward departure.

Plaintiffs push back against this result with a few other arguments that fall outside the three-factor test.  To start, they contend that they suffered more than their sister Zibandeh, who was awarded the <u>Heiser</u> baseline.  <u>See</u> Mot. Default J. at 21–22.  Their argument that, unlike Zibandeh, Plaintiffs were hospitalized on several occasions, has been dispatched above in the analysis of the second factor.  Their other position — that Zibandeh was never in Iran during

Abedini's imprisonment, while Plaintiffs experienced Abedini's captivity more directly — is more substantial and merits further discussion.

Elnaz visited Abedini in prison "three or four times" before fleeing to Turkey; Vahid visited him once, at the start of his imprisonment.  See Elnaz Decl., ¶ 36; Vahid Decl., ¶ 32.  But neither saw much of the conditions of Abedini's confinement during their visits.  Indeed, Elnaz "never talked to [Abedini] about his experiences in prison," only "receiv[ing] the terrible details of [Abedini's] imprisonment from [her] parents and others."  Elnaz Decl., ¶ 55.  Vahid, in his sole visit two months into Abedini's captivity, observed only that "[Abedini] had lost a lot of weight" and she "could see how bad he felt."  Vahid Decl., ¶¶ 31–32.  Because Elnaz and Vahid left Iran only six months into Abedini's three-year-plus confinement, see id., ¶¶ 31, 40, they received most of the details of his captivity from their parents.  They were thus not meaningfully more exposed to the conditions of Abedini's confinement than their sister Zibandeh.

Undeterred, Elnaz and Vahid assert that they deserve an upward departure because Abedini's ex-wife, Panahi, was granted one.  See Mot. Default J. at 22.  The Court is not persuaded.  First, the court in Panahi "did not purport to apply the Heiser framework," instead citing the Anderson award as a comparator, see Panahi, 2020 WL 6591425, at *10, which predated the Heiser framework and its "standardizing influence."  Alinejad v. Islamic Republic of Iran, 2023 WL 4684929, at *23–24 (D.D.C. July 6, 2023) (citing Kar v. Islamic Republic of Iran, 2022 WL 4598671, at *19 (D.D.C. Sept. 30, 2022)) (relying on this distinction to follow Abedini instead of Panahi in applying Heiser framework).  Second, even though Abedini's ex-wife and children did not see his imprisonment firsthand, they received much more detail about his torment than Plaintiffs witnessed.  Panahi suffered what she called "psychological torture," which seemed to be "deliberately facilitated by Iran."  Panahi, 2020 WL 6591425, at *8, 10

(quoting from record); see Alinejad, 2023 WL 4684929, at *24 (distinguishing Panahi on these "aggravating factors").  During Abedini's confinement, she received numerous letters from Abedini detailing his denial of medical care and the physical and psychological torture he suffered.  Panahi, 2020 WL 6591425, at *2.  After he was transferred to a new prison, Abedini used his new phone access to call her nightly to describe his suffering, including his fear for his life.  Id. at *2, 9 (quoting from record).  As his "mental condition began to deteriorate," leading him to become "increasingly verbally and emotionally abusive," Panahi was "forced to cease communications with him . . . to protect [herself] from falling apart and being completely destroyed."  Id. at *9.  Abedini even threatened to divorce her and take their children from her. Id.  Six months after Abedini's release, he indeed filed for divorce, compounding "the stress and suffering" that Panahi and her children experienced.  Id.  Although Plaintiffs maintain that their relationships with Abedini have been affected by his captivity, see Elnaz Decl., ¶ 64; Vahid Decl., ¶ 51, neither alleges the serious, permanent damage that their brother's captivity wrought on his relationships with his then-wife and children.

To be sure, Plaintiffs have suffered immensely.  But the Heiser baseline "accounts for this type of suffering and is designed to compensate [family members] for it."  Selig v. Islamic Republic of Iran, 573 F. Supp. 3d 40, 66 (D.D.C. 2021) (rejecting upward adjustment for decedent's family members' suffering from depression, anxiety, and "unbearable pain" for not "demonstrat[ing] an unusual degree of mental anguish") (quoting from record); see also Roth v. Islamic Republic of Iran, 78 F. Supp. 3d 379, 405 (D.D.C. 2015) (declining to adjust damages upward for bombing victim's family members who suffered emotional trauma and physical pain); Singer v. Islamic Republic of Iran, 2024 WL 3026554, at *12 (D.D.C. June 17, 2024) (refusing to depart from baseline because plaintiffs' "difficult and distressing" experience is

18

"consistent with those suffered by many [relatives] of victims of terrorism").  This Court will thus award Plaintiffs $1.25 million each in solatium damages as prescribed under Heiser.

        2.    *Bi Bi*

Under this framework, Bi Bi would typically receive $2.5 million.  Like her children, she requests a multiplier of 2.5 for an upward adjustment to $6.25 million.

As an initial matter, the Court will not award an upward departure to Bi Bi for her own suffering at the hands of Iranian police and prison guards for the same reasons that it denied an upward adjustment to Elnaz and Vahid for their interrogations.  See Section III.C.1, *supra*.

The Court nevertheless awards an upward departure under the second factor of the three-factor test because Bi Bi's emotional trauma was particularly severe.  She remained in Iran on and off throughout Abedini's captivity, visiting her son both in prison and in the hospital when he was sent there with a bleeding bladder, an injury induced by Iran's torture.  See Bi Bi Decl., ¶¶ 29–30, 35–36; Mot. Default J. at 9 ("More than anyone, it was Bi Bi [] who witnessed [Abedini's] suffering in person.").  During these visits, Abedini told her about "how they were beating him during the interrogations," and mother and son would cry together.  See Bi Bi Decl., ¶ 25.  These visits triggered emotional breakdowns, including physical symptoms, that were directly tied to witnessing Abedini's suffering.  Cf. Pautsch, 2024 WL 2864215, at *3 (finding inadequate nexus between nervous breakdowns and victim's death where breakdowns happened four and six years after that death).  Bi Bi fainted the first time she visited her son in prison.  See Bi Bi Decl., ¶ 22.  And when guards forced her screaming son out of the hospital and back to prison after he was denied a vital surgery for his bleeding bladder, she collapsed and had to be medicated.  Id., ¶ 36.  While Bi Bi also recounts several emergency-room visits both in Iran and the U.S., some are unexplained, and one overnight stay in particular seems more predicated by

the financial stress of supporting her children, paying for Abedini's commissary expenses, and flying to the U.S. to maintain her green card.  Id., ¶¶ 33–34, 45.  But given her substantial exposure to Abedini's confinement and two collapses that are intimately linked to his captivity, the Court finds Bi Bi's emotional trauma to be severe and unusual enough to warrant an adjustment.

Her requested adjustment of 2.5 times her baseline damages award, however, is "far greater than the relatively small departures that have generally been approved in this Circuit for family members of victims of torture."  Alinejad, 2023 WL 4684929, at *23 (cleaned up).  True, Bi Bi was more exposed to Abedini's confinement than her children were, but her experiences still do not amount to the detailed, daily deluge that Abedini's then-wife was receiving; nor has their relationship suffered the same lasting damage.  Cf. Bi Bi Decl., ¶ 44.  Instead, the Court will provide an upward adjustment of 20%, in line with Estate of Brown v. Islamic Republic of Iran, 872 F. Supp. 2d 37, 43–44 (D.D.C. 2012), where the victim's sister received a 20% upward adjustment because she suffered a nervous breakdown requiring a year of medication.  In all, she will receive $3 million.

### 3.  *Punitive Damages*

Although the aforementioned sums awarded to Plaintiffs are considerable, there is more on the table.  They also ask the Court to award punitive damages in an amount equal to compensatory damages.  As a threshold matter, it is not entirely clear that foreign family members (like Vahid and Bi Bi) can obtain punitive damages for claims brought under state law.  Compare Opati v. Rep. of Sudan, 590 U.S. 418, 427–28 (2020) (holding that punitive damages are available for cases brought under "new federal cause of action" in Section 1605A(c) but remanding for D.C. Circuit to "reconsider its decision concerning the availability

of punitive damages for claims proceeding under state law") with Wamai, 60 F. Supp. 3d at 97–98 (awarding punitive damages to non-U.S. family members matching their compensatory damages recovered under state law).  Even assuming such damages are available, the Court declines this request.

To determine whether punitive damages are warranted, courts factor into their analysis "the character of the defendant's act; the nature and extent of harm to the plaintiff that the defendant caused or intended to cause; the need for deterrence; and the wealth of the defendant." Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 32 (D.D.C. 1998); see also Acosta, 574 F. Supp. 2d at 30 (applying this test).  Notably, the nature and extent of harm to the plaintiff is only one of many considerations.  And the Supreme Court has indicated that for punitive-damages awards in general, the character of the defendant's act is particularly significant.  State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003) ("[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.") (quoting BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575 (1996)).

There is little doubt that Iran's conduct was reprehensible.  Yet because courts have already imposed $43,830,141 in punitive damages for the same acts against Abedini, see Panahi, 2020 WL 6591425, at *12; Abedini, 422 F. Supp. 3d at 142, this Court questions what further deterrence is to be gained here.  "Other judges in this district have noted that caution is required when punitive damages have been previously awarded against the same defendant for the same conduct."  Estate of Doe v. Islamic Republic of Iran, 943 F. Supp. 2d 180, 190 (D.D.C 2013) (citing Murphy, 740 F. Supp. 2d at 81).  This is because "[r]ecurrent awards in case after case arising out of the same facts can . . . over-punish[] the same conduct through repeated awards with little additional deterrent effect."  Murphy, 740 F. Supp. 2d at 81.  Although these courts

then proceeded to award punitive damages in the same ratio to compensatory damages, as in the related cases, this Court need not and will not do so.  Id. at 82 ("Punitive damages are not intended to compensate plaintiffs.  The fact that there may be variance from one case to another, even where those cases arise out of the same facts, such that some plaintiffs enjoy a higher award than others, raises no concern for inequitable compensation.").

Indeed, it is unlikely that Iran bases its conduct on whether victims have only one close relative who could claim damages or, as in this case, seven.  The concerns raised in Weinstein v. Islamic Republic of Iran, 184 F. Supp. 2d 13 (D.D.C. 2002), draw a helpful contrast.  There, the court worried that failing to award additional punitive damages in subsequent lawsuits could create perverse incentives, limiting the defendant's exposure if it injured several individuals in "one massive terrorist act as opposed to killing them in three separate acts."  Id. at 25–26.  That quandary is missing here, as the primary victim (Abedini) was awarded punitive damages, and the most significantly affected secondary victim (his ex-wife) was similarly compensated.  Because Plaintiffs here are not similarly situated to either of them, there is no possibility for perverse incentives.

The Court recognizes that it is deviating from how some other judges in this district have handled punitive damages.  Even so, the award of punitive damages "rests within the sound discretion of the trial court."  Subscription Television of Greater Washington v. Kaufmann, 606 F. Supp. 1540, 1546–47 (D.D.C. 1985) (citing Mariner Water Renaturalizer v. Aqua Purification Systems, Inc., 665 F.2d 1066, 1071 (D.C. Cir. 1981)).  As several courts have noted, there is no "evidence that high awards have successfully deterred [Iran]."  Bluth v. Islamic Republic of Iran, 203 F. Supp. 3d 1, 26 (D.D.C. 2016); accord Neiberger v. Islamic Republic of Iran, 2022 WL 17370239, at *19 (D.D.C. Sept. 8, 2022), report and

recommendation adopted, 2022 WL 17370160 (D.D.C. Sept. 30, 2022); Christie v. Islamic

Republic of Iran, 2020 WL 3606273, at *21 (D.D.C. July 2, 2020).  These large punitive

awards, moreover, are not costless, as this Court's predecessor observed:

> Over a decade ago, in 2009, Iran had "10 billion in . . . outstanding
> court judgments" in FSIA cases.  In re Islamic Republic of Iran
> Terrorism Litig., 659 F. Supp. 2d 31, 37 (D.D.C. 2009).  That
> amount has surely ballooned over the last decade.  Adding hundreds
> of millions of dollars to that amount in this case is not likely to have
> a meaningful deterrent effect.  Indeed, given "that the prospects for
> recovery upon judgments entered in these cases are extremely
> remote," large awards of punitive damages in cases like this one
> "may . . . serve only to expose" the political branches "to an
> unprecedented burden in [their] management of United States
> foreign policy towards Iran."  Id. at 37–38; see also Comment,
> Exceptional Judgments: Revising the Terrorism Exception to the
> Foreign Sovereign Immunities Act, 127 Yale L.J. 1890, 1900 (2018)
> ("[T]he outstanding judgments threaten to frustrate Iran's
> reintegration into the global economic community.").

Christie, 2020 WL 3606273, at *29.

The Court agrees with the other district courts that Iran's conduct in these cases is truly

deplorable.  Here, however, there is very little to be gained by adding to the whopping

$43,830,141 in punitives already granted for Abedini's detention.  The Court will consequently

not award additional punitive damages.

*     *     *

In sum, the Court will award $5,500,000 in damages to Plaintiffs, distributed as follows:

| Plaintiff | Total Compensatory |
| --- | --- |
| Elnaz Abedinigalangashy | $1,250,000 |
| Vahid Abedinigalangashy | $1,250,000 |

| Bi Bi Tahereh Karmimi Izadi | $3,000,000 |
|---|---|
| Total | $5,500,000 |

## IV.    Conclusion

For these reasons, the Court will enter default judgment for Plaintiffs in the amounts listed above.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  September 18, 2024